UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

Michael Coletta, a/k/a Michael J.                    Case No. 05-88753-ast
Coletta and Susan Coletta, a/k/a                     Chapter 7
Susan A. Coletta,

                             Debtors.
-----------------------------------------------------------------X
Neil H. Ackerman, Bankruptcy Trustee of
The estate of Michael Coletta, a/k/a                 Adv. Proc. Nos. 06-8003 and
Michael J. Coletta and Susan Coletta,                          07-8300-ast
a/k/a Susan A. Coletta,                                      (consolidated)


                             Plaintiff,
v.


Rubber2Gold, Inc., Don Bosco, a/k/a
Don M. Bosco, Lawrence Cichanowicz,
Eton Holding, Ltd., Redfern Realty, LLC,
Jerry Rawls, and Rawls Family
Limited Partnership a/k/a Rawls Family, LP,

                             Defendants.
-----------------------------------------------------------------X

## DECISION AND ORDER ON REMAND

       This matter is before this Court following the entry of a Memorandum of Decision and

Order of the United States District Court for the Eastern District of New York (the "District

Court"), entered on August 9, 2010, remanding this matter to this Court (the "Remand Order").

[dkt item 184][1]  In the Remand Order, the District Court directed this Court to further clarify the

factual findings and legal determinations that led this Court to its Judgment entered on December

1, 2009 (the "Judgment"). [dkt item 154]

---

[1]  Unless otherwise noted, docket references ("[dkt item --]") are to the docket for adversary proceeding number 07-
8300.  This case is comprised of consolidated adversary proceedings numbered 06-8003 and 07-8300. [dkt item 57]

## Procedural History

Michael Coletta ("Coletta") and Susan Coletta (jointly, the "Colettas") filed this case under Chapter 7 of the Bankruptcy Code[2] on October 14, 2005 (the "Petition Date"). [Tr. Exh. 1][3]  Neil H. Ackerman, Esq. (the "Trustee" or "Plaintiff") was duly appointed as the Chapter 7 Trustee.  As of the Petition Date, Coletta was the plaintiff in an action pending in the Supreme Court of New York, Nassau County, against, *inter alia*, Don Bosco ("Bosco") and Rubber2Gold, Inc. ("R2G") for breach of contract, conversion, and breach of an implied covenant of good faith and fair dealing (the "State Court Action"). [Tr. Exh. 5]  The Trustee removed that action to this Court on January 5, 2006, and it was assigned adversary proceeding number 06-8003. [06-8003, dkt item 1]  In May 2007, the Trustee replaced Coletta as plaintiff in the adversary proceeding. [06-8003, dkt item 15]

Subsequently, on October 14, 2007, the Trustee initiated adversary proceeding number 07-8300, naming Bosco, R2G, Mr. Lawrence Cichanowicz, Eton Holding, Ltd., Redfern Realty, Mr. Jerry Rawls, and the Rawls Family Limited Partnership[4] as defendants. [dkt items 1, 4, & 39]  The claims in this second adversary proceeding substantially overlapped with the claims in the removed State Court Action.  On August 15, 2008, both adversary proceedings were consolidated for all purposes, including discovery and trial, by party stipulation. [dkt item 57]

The trial for the consolidated adversary proceedings was commenced on April 27, 2009, and continued on April 28, 2009.  On April 28, 2009, the Trustee rested his case-in-chief, following which all parties moved for involuntary dismissal under Rule 7041 of the Federal

---

[2] All references to the Bankruptcy Code refer to Title 11 of the United States Code. 11 U.S.C. § 101 *et seq.*
[3] Such references are to trial exhibits.  As per the Court's instructions, the Plaintiff's exhibits are numbered while defendants' exhibits are enumerated by letter.  Bosco and R2G filed one combined set of exhibits, and lettered exhibit references are to that set, unless otherwise noted.  References will be to Plaintiff's exhibits, where appropriate, without noting duplication with various defendants' exhibits.
[4] The original complaint in that adversary proceeding named "The Jerry Rawls Family Trust" as a defendant, but appears to have been an erroneous name for that defendant.  By party stipulation, the name was amended to the "Rawls Family Limited Partnership," a/k/a "Rawls Family, LP."  [dkt item 72]

Rules of Bankruptcy Procedure, which incorporates Rule 41 of the Federal Rules of Civil Procedure. FED. R. BANKR. P. 7041; FED. R. CIV. P. 41.  This Court took these requests on submission and scheduled a ruling conference for June 1, 2009.  In its ruling, this Court granted Motions for Directed Verdict in favor of all defendants other than R2G and Bosco.[5] [June 1 Tr. at 31:1–44:6][6]  On June 26, 2009, the Court entered an Order denying relief from all claims against Lawrence Cichanowicz, Eton Holdings, Ltd., Redfern Realty, LLC, Jerry Rawls, and the Rawls Family Limited Partnership. [dkt item 145]  No appeal has been taken from the June 26, 2009, Order.

The Court resumed the trial as to the remaining parties and claims on June 16, 2009, and concluded it on June 17, 2009.  Upon conclusion of the trial, this Court allowed for certain post-trial submissions. [June 17 Tr. at 59:9–60:19]  Once all submission deadlines passed, the matter was on submission before the Court.

The Court conducted another ruling conference on October 27, 2009, at which it stated its findings of fact, conclusions of law, and ruling on the remaining claims, in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 52 of the Federal Rules of Civil Procedure. FED. R. BANKR. P. 7052; FED. R. CIV. P. 52. [October 27 Tr. at 3:12–14:13]  On December 1, 2009, this Court entered its Judgment. [dkt item 154]

In its Judgment, this Court awarded the Trustee monetary relief against Defendants Bosco and R2G jointly and severally in the sum of $22,208.81.  This sum is comprised of

---

[5] This Court had previously entered a default judgment against Mr. Cichanowicz, but that judgment was later vacated. [dkt items 25-26, 58, & 81]

[6] Transcript references are generally to a range formatted x:y–a:b, whereby the relevant portion of the corresponding transcript begins at page x, line y, and ends at page a, line b.  Transcript dates are all within the 2009 calendar year.  Below is a list of transcripts referenced in this decision and their corresponding docket numbers.  The trial lasted four days: The transcript for April 27 is docket number 131; the transcript for April 28 is docket number 133; the transcript for June 16 is docket number 146; and the transcript for June 17 is docket number 140.  There were also two ruling conferences: The transcript for June 1 is docket number 177; the transcript for October 27 is docket number 179.

$12,000.00 in actual damages, together with pre-judgment interest at 9% *per annum* from March 31, 2003, through entry of Judgment, plus Plaintiff's costs in the amount of $250.00, together with post-judgment interest at the federal rate.  The Court denied all other relief sought by both sides. [dkt item 154]

On December 8, 2009, the Trustee filed a notice of appeal to the United States District Court for the Eastern District of New York. [dkt item 155]  On December 18, 2009, Defendants Bosco and R2G also filed a notice of appeal to that court. [dkt item 160]

The District Court considered the case on appeal.  On August 9, 2010, the District Court issued its Remand Order, directing this Court to issue a written decision setting forth all factual and legal determinations necessary to address whether Coletta, Bosco, and R2G had a binding and enforceable contract between them, whether such contract was breached, and whether certain defenses were applicable to bar recovery. [dkt item 184]  A fuller recitation of the District Court's requirements on remand, along with this Court's responses, follows the summary of facts, *infra*.

The following statement of facts and conclusions of law supplements but does not supersede this Court's oral findings and conclusions entered on the record on June 1, 2009, and October 27, 2009.[7]

### Jurisdiction

This Court has core jurisdiction over the consolidated adversary proceedings under 28 U.S.C. § 157(b)(2)(A), (C), (H), and (O), 28 U.S.C. § 1334, and the Standing Order of Reference in effect in the Eastern District of New York.

---

[7] The District Court remanded the adversary proceedings to this Court with instructions to issue a decision setting forth all factual and legal determinations necessary to address certain findings and holdings.  The Remand Order does not distinguish between findings explicitly made by this Court in its previous rulings and supplemental findings made part of this Decision, nor does this Decision so differentiate.

## Summary of Facts

Between the years 2002 and 2004, Coletta entered into a series of agreements with Bosco relating to a proposed joint business venture, the subject of which was the ownership and operation of a tire recycling facility.  In the agreements, and throughout the series of drafts they exchanged, there was a common theme and structure: Bosco would form a new company that would operate the tire recycling business that was operated by Coletta at premises owned by a corporation owned by Coletta, and Coletta would work for the new company.  The recycling business possessed one of the few, if not the only, authorized licenses to operate such a tire recycling business in the New York City and Long Island area.  The recycling business was located at 1629 Redfern Avenue, Far Rockaway, New York 11691 (the "Redfern Property"), and was, during the relevant period between 1998 and 2004, owned by Coletta Properties, Inc. ("Coletta Properties"), an entity wholly owned by Coletta.

Coletta and his recycling business were suffering financial trouble for several years.  In 1999 the Redfern Property was made the subject of a foreclosure action filed by Frediva Associates ("Frediva"), the holder of a first mortgage on the Redfern Property.  On multiple occasions thereafter, Coletta remitted payments to Frediva in order to delay the sale of the Redfern Property.  For several years, Coletta attempted to find buyers who would purchase the recycling business, in order to avoid foreclosure.

In early 2002, Coletta was introduced to Bosco, who showed interest in purchasing the business.  At that time, a foreclosure sale date for the Redfern Property had been set.  In an attempt to delay the sale and buy time to conduct due diligence, Bosco assisted Coletta in finding a bankruptcy attorney to help Coletta Properties file for bankruptcy protection.  On February 15,

2002, Coletta Properties filed a chapter 11 bankruptcy case, represented by an attorney paid with funds advanced by Bosco.[8]

### The February 2002 Agreement

On February 26, 2002, Coletta, individually as well as on behalf of Coletta Properties and Jack Coletta, Inc., another company wholly owned by Coletta, entered into an agreement with Bosco and Newco, a corporation Bosco was to form (the "February Agreement"). [Tr. Exh. 47] Under the February Agreement, Newco was to purchase the Redfern Property and all assets owned by Coletta and his aforementioned companies, including all machinery, equipment, business, contracts, and goodwill, for a total consideration of $1 million, less certain adjustments.[9]  The purchase was subject to an extendable ninety-day due diligence period during which Newco could inspect the title, property, creditors, licenses, and permits; however, the February Agreement did not contain an outside closing date.  In the February Agreement, Coletta warranted that the licenses, permits, and certificate of occupancy were in full force and effect.

Upon completion of the purchase, Newco would operate the business under the then-existing permits and licenses.  Newco would also employ Coletta as operations manager for a period of three years, with an optional two-year renewal period, at a net pay of $1,000.00 per week. [Tr. Exh. 47]

Bosco attempted to secure funding in order to finalize the contemplated transaction, but he did not succeed.  Thus, the transactions contemplated under the February Agreement could not come to fruition, and the deal never closed.

On June 19, 2002, the Coletta Properties bankruptcy case was dismissed.

---

[8] Bankruptcy case number 02-12029-jf was filed in the United States Bankruptcy Court for the Eastern District of New York. [Tr. Exh. B]

[9] Adjustments included such expenses as satisfying a first mortgage held by Frediva, worth $220,000.00.

***The August 2002 Agreement***

In spite of the lack of a closing under the February Agreement, Bosco remained interested in the Redfern Property and the recycling business. Bosco engaged Fieldstone Services Corp. ("Fieldstone") as a financial advisor. On August 21, 2002, Fieldstone drafted a business plan for Bosco, denominated as "Business Plan for Rubber2Gold," to operate the recycling business at the Redfern Property. [Tr. Exh. 51] In a draft report that was never finalized, Fieldstone estimated that the Redfern Property and improvements thereon were worth $1,237,880.00, and estimated that the equipment associated with such property and business was worth $599,000.00. [Tr. Exh. 51]

On August 26, 2002, Coletta, individually and on behalf of Coletta Properties, entered into an agreement with R2G, a corporation that had recently been formed by Bosco (the "August Agreement"). [Tr. Exh. 52] This agreement was essentially an updated version of the February Agreement. Under the August Agreement, R2G would purchase the "land and building" at the Redfern Property for $1 million minus adjustments, subject to R2G obtaining financing. The August Agreement has no explicit provision for sale of the licenses and permits, although there is a provision representing that the permits are in effect and may be transferred to R2G, and a provision allowing R2G to use the licenses and permits until they could be transferred or reissued to R2G.

The August Agreement also included an employment clause whereby if the parties were to close the sale, Coletta would act as operations manager and would receive $1,000.00 per week for three years, with a renewable two-year option. [Tr. Exh. 52] As with the February Agreement, there was no outside closing date.

### The Foreclosure Sale

Prior to any closing under, or termination of, the August Agreement, on October 11, 2002, the Redfern Property was sold to Frediva at a foreclosure sale. However, prior to the time the foreclosure sale occurred, Bosco had an agreement in place with Frediva to essentially purchase the Redfern Property from Frediva, if Frediva were the high bidder at the sale. After the foreclosure sale was held, in a letter from Bosco to Coletta dated October 28, 2002, Bosco, as president of R2G, confirmed the offer to employ Coletta as facilities manager for a net weekly pay of $1,200.00,[10] subject to Bosco and R2G's closing the purchase from Frediva. [Tr. Exh. 60] On October 31, 2002, Frediva assigned all of its rights as high bidder for the Redfern Property to R2G, in exchange for $250,000.00. [Tr. Exh. 61]

### The November Agreements

The Frediva foreclosure did not derail the discussions between Bosco and Coletta. In addition to the October 28, 2002, letter referenced above, in November 2002, Bosco, as president of R2G, and Coletta individually, conducted negotiations regarding the operation of the Redfern Property. These negotiations resulted in exchanges of several draft agreements. Many of the details regarding the drafting and ultimate execution of the November agreements are disputed.

A handwritten facsimile dated November 4, 2002 (the "November 4 Document"), sets forth some general terms of a business arrangement, including the following: Coletta was to receive a 50% ownership interest in R2G or in any other corporation that would hold title to the Redfern Property; if the 50% ownership was not delivered to Coletta and the property was sold, Coletta was to receive 50% of the net profit from the sale, after taxes and expenses were deducted; business decisions were to be made jointly by Bosco and Coletta; no payments above

---

[10] Notably, the August Agreement had set the compensation amount at $1,000.00. [Tr. Exh. 52]  This discrepancy may indicate an intermediate agreement between the parties, but that fact does not alter the Court's determinations and rulings.

$1,000.00 were to be made without both Bosco and Coletta's consent; the Redfern Property would not be mortgaged or refinanced without mutual approval; and compensation was to be made equally to Bosco and to Coletta. [Tr. Exh. 62]

Handwritten at the top of that November 4, 2002, facsimile transmission is the caption "Don for comments," along with Coletta's signature.  In the document there are handwritten corrections made by Bosco, and Bosco's signature appears at the bottom of that facsimile transmission. [Tr. Exh. 62]  Bosco alleges that he did not sign the November 4 Document in November 2002, but rather, almost a year later, in October 2003, under duress, when Coletta was assigning his rights to a Manny Garofalo ("Garofalo"), further discussed, *infra*. [June 16 Tr. at 30:23–32:16]

A typed facsimile transmission dated November 5, 2002 (the "November 5 Document"), sets out many of the same terms as the November 4 Document.[11] [Tr. Exh. 63]  There are some noteworthy differences, though.  The November 5 Document refers to Coletta's 50% ownership interest as being delivered "as part of the work agreement."  Neither party introduced a separate work agreement, though the November 5 Document does contain a work provision similar to that contained in the November 4 Document, granting Coletta a net weekly pay of $1,200.00.  The November 5 Document repeats the provision from the November 4 Document whereby Bosco and Coletta are to receive equal compensation, but as noted, the November 5 Document sets this amount as $1,200.00 per week.  The November 5 Document also explicitly states that the "property includes the use of the Certificate of Occupancy and existing license, that allows tire, metal and other forms of recycling."

---

[11] Throughout the trial documents, the date attributed to this document is sometimes November 9, 2002, as that is the date that appears next to the signatures at the bottom of the document.

The November 5 Document has Bosco's signature on it, both individually and as president of R2G, dated November 9, 2002.  The document also contains many comments admittedly handwritten and initialed by Bosco. [Tr. Exh. 63; April 28 Tr. at 119:11–119:17]  In his testimony, Bosco denied having signed the November 5 Document in his capacity as an individual, and said both that he signed it on behalf of R2G and that he did not believe he signed the November 5 Document at all. [*Compare* April 28 Tr. at 37:11–38:14 *with* June 16 Tr. at 33:7–34:8]

A facsimile transmission of a typed document dated November 11, 2002 (the "November 11 Agreement"), incorporates Bosco's handwritten changes from the November 5 Document. [Tr. Exh. 64]  The November 11 Agreement includes two additional comments admittedly handwritten and initialed, though not admittedly signed, by Bosco. [June 16 Tr. at 97:10–98:24] One of the comments reduces Bosco's and Coletta's 50% ownership interests in R2G to 48.75% each, due to a 2.5% ownership interest having been given by Bosco to Lawrence Cichanowicz. The other initialed comment states that the document supersedes all prior written and oral agreements.

The November 11 Agreement includes the provision whereby Coletta is to operate as facility manager at the Redfern Property and receive a salary of $1,200.00 per week.  The November 11 Agreement is signed by Coletta individually, and by Bosco individually and as president of R2G, and is dated November 11, 2002. [Tr. Exh. 64]

In his testimony, Bosco denied ever having signed the November 11 Agreement. [April 28 Tr. at 38:15–38:18]  However, in a letter from R2G to Coletta dated November 20, 2002, signed by Bosco, R2G confirms an offer to pay a weekly sum of $1,200.00 to Coletta in exchange for Coletta acting as facility manager at the Redfern Property. [Tr. Exh. 65]

Coletta testified that the November 11 Agreement was a final and binding contract. [April 27 Tr. at 61:9–61:16 and 81:1–81:10]  Bosco testified that that document, as well as the November 4 Document and the November 5 Document, was merely a draft of an agreement, and that the parties never actually reached a final agreement. [Bosco Affidavit, dkt item 115 ¶¶ 26-27]

### The Transfer of the Redfern Property to R2G

Although R2G acquired Frediva's high bid rights in the Redfern Property on October 31, 2002, Bosco testified that the deed from the foreclosure referee was not issued to R2G until February 25, 2003. [Bosco Affidavit, dkt item 115 ¶ 24]  Bosco testified that by the time R2G received the deed, there was no ongoing business taking place at the Redfern Property, and that, in fact, R2G was never able to conduct business at the premises.  He also testified that Coletta had misrepresented the permits and licenses as valid and transferable when they in fact were not. [June 16 Tr. at 69:21–71:3]  Additionally, Bosco testified that the New York State Department of Environmental Conservation (the "DEC") had found environmental violations on the property and had prohibited any operations on the Redfern Property until remedied. [June 16 Tr. at 50:18–51:5; Tr. Exh. V]

Coletta testified that he acted as facility manager for ten weeks. [Coletta Amended Affidavit, dkt item 120 ¶ 97]  Coletta testified that between December 2002 and March 2003 he was given five checks totaling $12,000.00 from R2G as compensation for work performed in the period between October 2002 and March 2003, but that the checks were not honored when presented to the bank. [Coletta Amended Affidavit, dkt item 120 ¶¶ 99-100; Tr. Exh. 105] Bosco countered that Coletta never worked for R2G, that what Coletta had in his possession were mere copies of checks Coletta had asked Bosco to write, and that the original paychecks

were never actually given to Coletta to be cashed, nor were they ever intended to be cashed. [Bosco Affidavit, dkt item 115 ¶¶ 28-29; Tr. Exh. BB]  Bosco produced the original unnegotiated five checks totaling $12,000.00 at trial. [Tr. Exh. SS]

It is undisputed that by April 2003 Coletta was no longer working for R2G because he had accepted a job with another company, Omni Recycling of Babylon. [Coletta Amended Affidavit, dkt item 120 ¶¶ 104-05]

In a letter dated June 13, 2003, Bosco informed Coletta's attorney, Raymond Verdi, Esq., that R2G had terminated its services arrangement with Coletta due to Coletta's extreme emotional distress that interfered with his work performance. [Tr. Exh. 67]

### The Garofalo Assignment and Release

In September or October 2003, Coletta assigned whatever rights he had in the November 4 Document to Garofalo. [Tr. Exhs. P, Q]  Coletta testified that prior to September 2003, Garofalo had lent him or his businesses money, and that was at least one of the reasons for making the assignment to Garofalo.  Coletta never listed Garofalo as a creditor in any of his personal bankruptcy schedules.[12] [Coletta Amended Affidavit, dkt item 120 ¶ 24; April 27 Tr. at 45:10–56:21]

Bosco's signature is on the November 4 Document that Coletta assigned his rights under, but Bosco testified that it was only at this point in time, in October 2003, that he signed the November 4 Document, and that the only reason he signed it was because he was threatened with physical violence by Garofalo. [June 16 Tr. at 30:15–30:25 and 34:16–34:23]

On June 1, 2004, Garofalo reassigned all the rights Coletta had assigned to him under the November 4 Document back to Coletta. [Tr. Exh. AA]

---

[12] It is unclear whether the amounts Garofalo gave to Coletta were loans or investments, and whether Coletta personally had a repayment obligation or it was one of Coletta's companies' obligations. [*See* Coletta Amended Affidavit, dkt item 120 ¶ 24; April 27 Tr. at 45:10–56:21 and 173:3–173:7]

On July 20, 2004, Bosco entered into an agreement with Garofalo, whereby Garofalo released both Bosco and R2G from all claims he may have had against them. [Tr. Exhs. X, Y] Bosco alleges that he was unaware of the preceding reassignment of rights from Garofalo to Coletta, and that he thought he was being released from all the claims that could have arisen out of his 2002 dealings with Coletta. [June 16 Tr. at 30:11–32:16 and 105:5–105:17]

Coletta testified that his original assignment to Garofalo was invalid because it assigned rights in a non-final, superseded draft agreement.  Any release granted by Garofalo was therefore inconsequential as to Coletta's rights.  He stated that the reassignment was not necessary, and that it was done as a mere precaution, because the original assignment was itself invalid. [Coletta Amended Affidavit, dkt item 120 ¶¶ 110-12]  Bosco, on the other hand, testified that he did indeed sign the November 4 Document, even if almost a year after its original date, and that he thereafter considered it binding.  He therefore considered the release agreement with Garofalo as encompassing any rights Coletta may have had against Bosco that arose from the 2002 dealings between Bosco and Coletta. [Bosco Affidavit, dkt item 115 ¶¶ 30, 32]

### The Sale of the Redfern Property to Redfern Realty

Regardless of his dealings with Coletta and Garofalo, Bosco was unable to operate the Redfern Property profitably and decided to cut his losses by selling the property.

By the middle of 2003, Bosco had in his possession a copy of a March 18, 2001, appraisal report conducted by Powell Appraisers, Inc., valuing the Redfern Property at close to $2 million. [Tr. Exh. 36]  He also had in his possession the August 2002 draft Fieldstone report. However, because the appraisal was outdated, and because Bosco believed that appraisal was inflated, and because the Fieldstone report was a draft and similarly outdated, Bosco obtained an

independent appraisal of the property in connection with his sale efforts.  He retained Ford

Valuation Services, Inc., which valued the property at $714,000.00 in July 2003. [Tr. Exh. L]

In February 2004, Bosco placed an advertisement in the New York Times, offering to sell

the Redfern Property for $800,000.00. [Tr. Exh. 72]  Bids from potential buyers ranged from

$550,000.00 to $800,000.00.[13]  Ultimately, R2G agreed to sell the Redfern Property to Redfern

Realty, LLC ("Redfern Realty") for $716,846.00 minus certain adjustments. [Tr. Exh. 80]  In

connection with the sale to Redfern Realty, an additional appraisal was obtained by Redfern

Realty's mortgagee, Banco Popular North America, on September 10, 2004, valuing the Redfern

Property at approximately $700,000.00. [Tr. Exh. M]  In November 2004, R2G sold the property

to Redfern Realty, for a gross amount of $716,846.00. [Tr. Exh. 80]

Bosco spent a total of approximately $800,000.00 in purchasing and maintaining the

Redfern Property prior to the sale to Redfern Realty. [Tr. Exh. 84]  This amount includes: the

original purchase price of $250,000.00 paid to Frediva for Frediva's rights to the Property;

$231,786.00 in interest payments to various lenders, including $100,000.00 to Jerry Rawls and

the Rawls Family Limited Partnership; property taxes amounting to $125,331.00; and

approximately $125,000.00 in expenses affiliated with the environmental cleanup required by the

DEC. [Tr. Exh. 84]  During the time R2G owned the facility, it made no profit. [Tr. Exhs. 88-90]

Thus, R2G suffered a net loss of approximately $100,000.00 in connection with the Redfern

Property, and therefore there was no net profit to share with Coletta, whether under a 50/50

arrangement or otherwise. [Bosco Affidavit, dkt item 115 ¶ 42]

---

[13] In the Coletta Properties' 2002 bankruptcy schedules, Coletta listed the Redfern Property as being worth $700,000.00. [Tr. Exh. B]

*The Litigation Claims*

Coletta's State Court Action, which was later removed to this Court as adversary proceeding number 06-8003, sought relief from Bosco, R2G, and Mr. Cichanowicz for breach of contract, conversion, and breach of an implied covenant of good faith and fair dealing. [Tr. Exh. 5]  That action also sought relief for unpaid salaries for ten weeks of services Coletta allegedly performed for R2G. [06-8003, dkt item 22]

Adversary proceeding number 07-8300 against R2G, Bosco, Mr. Cichanowicz, Eton Holdings, Ltd., Redfern Realty, Mr. Jerry Rawls, and the Rawls Family Limited Partnership sought relief for breach of contract, in the alternative, of the August Agreement or the November 11 Agreement, whichever would be deemed controlling. [dkt item 39]  If the August Agreement were found to control, the Trustee would seek $1 million for R2G not having performed its purchase obligation.  If the November 11 Agreement were found to control, the Trustee would seek 50% of the total net earnings, both from operations and from the sale of the Redfern Property to Redfern Realty.[14]  In adversary proceeding number 07-8300, the Trustee also sought to avoid the transfer of the Redfern Property from R2G to Redfern Realty as a fraudulent conveyance, and alleged that the transfer terms additionally constituted a breach of Bosco and R2G's fiduciary duty that they owed to Coletta under the November 11 Agreement. [dkt item 39]  The Trustee also sought to avoid transfers by R2G to Jerry Rawls, to the Rawls Family Limited Partnership, to Lawrence Cichanowicz, and to Eton Holding, Ltd. as fraudulent, usurious, or lacking consideration. [dkt item 39]

---

[14] The Complaint in adversary proceeding number 07-8300 does recognize the 2.5% carveout from the ownership interest in R2G that was to be given to Mr. Cichanowicz, supposedly reducing both Bosco's and Coletta's ownership interests to 48.75% each, yet proceeds to claim a 50% interest in the supposed profit from the sale of the Redfern Property. [dkt item 39]

As noted, on August 15, 2008, adversary proceeding numbers 06-8003 and 07-8300 were consolidated for all purposes. [dkt item 57]

***Procedural Posture***

Following this Court's December 1, 2009, Judgment [dkt item 154], the parties cross appealed to the United States District Court for the Eastern District of New York. [dkt items 155, 160]  On August 10, 2010, the District Court remanded the appeal to this Court for further clarification of this Court's ruling and Judgment, pursuant to Rule 8013 of the Federal Rules of Bankruptcy Procedure. [dkt item 184] FED. R. BANKR. P. 8013.  In the order remanding the case, the District Court requested this Court to issue a written decision setting forth the factual and legal determinations necessary to address the following matters:

1)  Whether the November 11 Agreement was supported by adequate consideration;

2)  Whether the facsimile transmission copy of the November 11 Agreement proffered by Coletta is authentic within the meaning of Rule 1003 of the Federal Rules of Evidence;

3)  Whether the doctrine of unclean hands bars Coletta from recovering under the November 11 Agreement.  The District Court asked this Court to evaluate Coletta's assignment to Garofalo, the mutual releases between Garofalo, Bosco, and R2G, and Garofalo's reassignment to Coletta;

4)  If the November 11 Agreement is valid and enforceable, whether Coletta is entitled to compensation for services performed at the Redfern Property;

5)  Whether Bosco or R2G breached the duty of good faith and fair dealing implied in the parties' contracts;

6)   Whether Bosco, R2G, and Coletta had a fiduciary relationship between them, and if so, whether Bosco or R2G breached any of their fiduciary duties; and

7)   Whether the Trustee has standing to assert a fraudulent conveyance claim, and if so, whether Bosco or R2G fraudulently conveyed the Redfern Property to Redfern Realty.

[dkt item 184]

## Discussion of Questions on Remand

This Court will first summarize its findings and conclusions, and then address separately each question on remand.

This Court determined that the November 11 Agreement is the controlling agreement between Coletta, Bosco, and R2G.  The Court finds that agreement to have been negotiated and entered into with sufficient consideration, and that it supersedes any prior agreements between the parties.

The Court finds that no fiduciary relationship existed between the parties, and that therefore Bosco and R2G owed no fiduciary duty to Coletta.  On a similar note, the Court finds that there was no breach of the implied covenant of good faith and fair dealing between the parties.  More specifically, the Court finds that although Bosco's business ethics may have been dubious, there was no bad faith dealing by Bosco and R2G in purchasing the Redfern Property from Frediva, even though at that time Bosco was bound by the August Agreement with Coletta. The Court also finds there was no bad faith dealing when R2G sold the Redfern Property to Redfern Realty.

The Court similarly finds that although Coletta's business ethics in dealing with Garofalo may have also been dubious, there was no bad faith on Coletta's part when he assigned his

contractual rights under the November 4 Document to Garofalo, and there was no bad faith dealing by Coletta when accepting the reassignment from Garofalo.  Finally, this Court finds that the dealings between the parties do not rise to the level of unclean hands, on either side, that would bar court-sanctioned recovery to either party.

Under the November 11 Agreement, Bosco and R2G were to pay Coletta $1,200.00 per week in exchange for Coletta's work as facility manager for the Redfern Property.  This Court finds that Coletta did indeed provide services for ten weeks and is therefore entitled to compensation for those services under the November 11 Agreement.

Bosco and R2G also promised to pay Coletta 48.75% of the net profit from a sale of the Redfern Property.  Because this Court finds that R2G sold the Redfern Property at a loss, there is no net profit to share.  Additionally, this Court finds there was insufficient evidence that the sale to Redfern Realty was anything other than an arm's length sale for a reasonable price under the circumstances, after the property was appropriately advertised for sale.  No claim for artificial lowering of gains can stand.

Further, because Coletta individually never possessed an ownership interest in the Redfern Property, the Trustee cannot bring an avoidance action for fraudulent conveyance under Section 548 of the Bankruptcy Code. 11 U.S.C. § 548.  Alternatively, there is insufficient evidence of actual or constructive fraud in R2G's sale of the Redfern Property to Redfern Realty, and, as such, the Trustee did not meet his burden of proof on the avoidance action.

### The Copy of the November 11 Agreement Was Properly Admitted

In its Remand Order, the District Court requested this Court address whether the November 11 Agreement was authentic within the meaning of Rule 1003 of the Federal Rules of Evidence. [dkt item 184]; FED. R. EVID. 1003.

18

Under Rule 1003 of the Federal Rules of Evidence, "[a] duplicate [document] is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." FED. R. EVID. 1003.  A duplicate document is defined as a counterpart of an original document. FED. R. EVID. 1001.

The Court admitted a facsimile of the November 11 Agreement over Bosco's and R2G's objections on authenticity grounds. [Tr. Exh. 64; Joint Pre-Trial Memorandum, dkt item 107 p. 15 ¶ E; April 27 Tr. at 157:20–157:24]  The Court finds that it is not unfair to admit the facsimile transmission in lieu of the original.  Additionally, the Court finds that no genuine question as to the authenticity of the original document was raised.

Bosco alleged that he did not sign the November 11 Agreement.  The Court does not find his denial credible.  Further, Bosco's actual contention relates only to the execution of the document and not to the document's contents.  In other words, Bosco did not cite to any portion of the November 11 Agreement that he did not write, review, or agree to in November 2002.  He simply said he did not sign it.

Further, the November 11 Agreement is merely a typed version of previous drafts which the parties had exchanged.  The November 11 Agreement itself contains handwritten comments that Bosco admits he wrote.  One comment specifically reduces the ownership interest in R2G, or compensation from a sale of the Redfern Property, that Coletta was to receive, due to a transaction Bosco admittedly entered into with Mr. Cichanowicz.  Additionally, Coletta and Bosco would regularly transmit drafts to each other by facsimile, with handwritten comments being used to iterate one facsimile transmission in preparation for a revised draft or final

document. The Court finds that Bosco's questions raised as to the authenticity of the November 11 Agreement are not genuine and do not preclude admitting the document into evidence.

Further, a letter from R2G to Coletta, dated November 20, 2002, specifically confirming the existence of at least the employment portion of the November 11 Agreement further solidifies the Court's finding that the November 11 Agreement document is indeed authentic within the meaning of Rule 1003, and admissible. *See* FED. R. EVID. 1003.

### The November 11 Agreement is Supported by Adequate Consideration

The District Court directed this Court to set forth the factual and legal determinations necessary to address whether the November 11 Agreement was supported by adequate consideration. [dkt item 184]

"Formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981). Consideration must be a bargained for performance or return promise. *Id.* at § 71. A court's primary task, though, is determining existence of consideration rather than its value. *In re 37-02 Plaza LLC*, 387 B.R. 413, 418-19 (Bankr. E.D.N.Y. 2008).

In November 2002, Bosco and R2G admittedly entered into negotiations with Coletta regarding the recycling business. These negotiations were generally an extension of the February and August 2002 discussions and agreements, and were meant to produce an agreement that would supersede the August Agreement.

By November 2002, R2G had already purchased the high bid rights Frediva had in the Redfern Property, regardless of Coletta Properties' interest in that property. The terms negotiated between Coletta and Bosco, therefore, did not involve the transfer of title to the property, but rather revolved around terms for R2G's use of various permits and licenses Coletta

possessed or had access to by virtue of his ownership of related entities.  Mere ownership of the property did not authorize R2G to operate a recycling business on the premises; R2G needed Coletta's property permits and authorizations, in addition to Coletta's expertise.

Bosco, R2G, and Coletta were all to gain from the formation of an agreement.  Under the November 11 Agreement, Bosco and R2G were to receive permission from Coletta to use valuable licenses and permits to operate the tire recycling business Bosco wanted to be in, and Coletta's expertise in running such a business.  In return, Coletta was to work at the business and would receive a 48.75% ownership interest in R2G and a net weekly salary of $1,200.00.  Although similar terms were part of the August Agreement, the August Agreement was no longer in effect by the time the November 11 Agreement was negotiated.  The Court therefore finds that these bargained for promises and return promises constitute new, adequate consideration to support the November 11 Agreement.

### No Fiduciary Relationship

The Remand Order from the District Court requested this Court to determine whether there existed a fiduciary relationship between Bosco, R2G, and Coletta, and, if so, whether any fiduciary duties were breached. [dkt item 184]  The Trustee had argued that Bosco and R2G had breached their fiduciary duty towards Coletta in their sale of the Redfern Property to Redfern Realty.  This Court rejects that claim.

Whether a fiduciary relationship exists is a question of state law.  Under New York state law, in order to sustain a claim for breach of a fiduciary duty, a plaintiff must first demonstrate the existence of a fiduciary relationship between the parties. *See Atlantis Info. Tech. GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 231 (E.D.N.Y. 2007) (citing *CFSC Capital Corp. XXVII v. W.J. Bachman Mech. Sheet Metal Co., Inc.*, 669 N.Y.S.2d 329 (N.Y. App. Div. 1998)). "[F]our

elements . . . are essential to the establishment of a fiduciary relationship: (1) [t]he vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself." *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 56-57 (E.D.N.Y. 2006) (citing *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436, 438 (N.Y. Sup. Ct. 1998), *aff'd*, 705 N.Y.S.2d 661 (N.Y. App. Div. 2000)).

This Court finds that there was no fiduciary relationship between the parties, and that therefore no claim for a breach of fiduciary duties can stand. Coletta originally managed the recycling business. He was introduced to Bosco when he sought to sell the business. Each had something to gain—Bosco wanted to enter the recycling industry, and Coletta needed financial strength. Coletta's financial difficulties preceded his meeting Bosco and were not caused by Bosco. There is no reason to believe that Bosco was in a position of power over Coletta any more than in a standard commercial transaction setting. The dealings between the parties were within the realm of ordinary commercial transactions and at arm's length. In such circumstances there is no fiduciary relationship, absent extraordinary circumstances. *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 57 (E.D.N.Y. 2006) ("[W]here parties deal at arm's-length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (quoting *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y. 1991)). This Court does not find any such extraordinary circumstances in this case. There is no fiduciary relationship, and therefore no fiduciary duties, between the parties.

### *No Violation of Good Faith and Fair Dealing*

The District Court directed this Court to detail its findings regarding Bosco and R2G's possible violation of their duty of good faith and fair dealing implied in the parties' contract. [dkt item 184]

Under New York law, every contract contains an implied covenant of good faith and fair dealing that encompasses an understanding that no party to that contract will intentionally or purposely do anything to prevent the other party from carrying out its part of the agreement. *Designers N. Carpet, Inc. v. Mohawk Indus., Inc.*, 153 F. Supp. 2d 193, 196 (E.D.N.Y. 2001).[15] But "[i]ntegral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). The implied covenant similarly does not undermine the parties' general right to act in their own interest in a manner that may incidentally lessen another party's anticipated gains from the contract. *Id.*

The August Agreement between R2G and Coletta and Coletta Properties provided that Bosco would purchase the Redfern Property from Coletta. The agreement was explicitly conditioned upon Bosco obtaining financing for the purchase, which he was ultimately unable to obtain. Additionally, Frediva subsequently purchased the rights to the Redfern Property at a regularly conducted foreclosure sale, rendering performance by Coletta impossible. Therefore, neither Coletta nor Bosco could perform under the August Agreement.

---

[15] This implied covenant of good faith and fair dealing does not give rise to a separate and independent cause of action, but rather can be the basis for a cause of action for breach of the underlying contract. *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992); *O'Hearn v. Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 11-12 (E.D.N.Y. 1998).

Although Bosco and R2G were unable to obtain full financing to purchase the Redfern Property from Coletta directly, they were able to obtain sufficient funding to purchase the rights in Frediva's high bid for the property.

There is no evidence of foul play rising to the level of bad faith in this transaction. With Bosco's help, Coletta Properties filed bankruptcy in order to temporarily halt the sale, but was unable to ultimately stop the foreclosure sale, therefore rendering Coletta unable to perform the August Agreement. R2G came to own the Redfern Property regardless of the August Agreement through no bad faith or unfair dealing, and continued to negotiate with Coletta notwithstanding having acquired the Redfern Property.

Similarly, R2G's sale of the Redfern Property to Redfern Realty did not violate Coletta's explicit or implied rights under the November 11 Agreement. The November 11 Agreement stated that "at anytime Michael Coletta . . . will receive at no cost [48.75]% ownership in Rubber 2 Gold Inc. or any other corporation that holds the title to the property . . . ."[16] [Tr. Exh. 64] Although this language seems to create a contractual obligation for Bosco to deliver an interest in R2G to Coletta, the agreement also contains an alternative provision stating that if Coletta did not receive that ownership interest and the business were sold, then Coletta was to receive 48.75% of the net profit from the sale of the property.

Whether this alternative clause is read as a mere contingency or as a liquidated damages clause, the Court finds that there was no bad faith dealing in Bosco and R2G's sale of the property to Redfern Realty.[17] Bosco did not, in fact, deliver the 48.75% ownership interest in R2G to Coletta, and so he and R2G are liable for sharing the net profit from the sale to Redfern

---

[16] The November 11 Agreement, signed by both parties, has a handwritten asterisk following two separate paragraphs that discuss 50% interests, modifying them to 48.75%. Although not absolutely clear on the face of the document, it seems that the interest at issue—the interest in the net profit from a sale—was similarly reduced to 48.75%.

[17] In the event this clause is read as a liquidated damages clause, the Court finds that it is fair and enforceable.

Realty, if any. There was no bad faith or unfair dealing in arriving at this explicitly contemplated contingency.

### *No Net Profit to Share in the Sale to Redfern Realty*

As noted above, Bosco did not, in fact, deliver the 48.75% interest in R2G to Coletta, and so he is liable for sharing the net profit from the sale of Redfern Property to Redfern Realty, if any. Bosco and R2G spent approximately $800,000.00 in acquiring, clearing title to, and cleaning up the Redfern Property, and were only able to sell it for $716,846.00. The sale, therefore, was for a loss, with no net profit to share with Coletta.

R2G purchased Frediva's rights in the Redfern Property for $250,000.00 in October 2002, with no rights to the permits or licenses necessary to operate the recycling business. The Court finds it sufficiently convincing that Bosco and R2G's expenses in connection with the cleanup and maintenance of the Redfern Property and clearing title roughly amounted to an additional $550,000.00. As noted above, the expense calculation includes interest payments on various loans that were obtained in connection with the purchase of the Redfern Property ($231,786.00), paying taxes against the property ($127,331.00), and rubber and waste removal required in order to comply with environmental regulations (approximately $115,000.00). The sale to Redfern Realty was for $716,846.00. Additionally, no profit was made by R2G in the interim between its purchase of the Redfern Property and the sale of that property to Redfern Realty. The Court therefore finds that there was no net profit from the sale, and therefore no amounts due to Coletta or the Trustee under the profit-sharing provision in the November 11 Agreement.

Additionally, the Trustee's claim that Bosco purposely reduced the value of the property must fail. Coletta had represented that the licenses and permits were intact when indeed they

were not.  Bosco did not have a duty under the November 11 Agreement to rectify or renew those licenses and permits.  Reduction in the Redfern Property's value due to deficiencies in the licenses and permits is not to be attributed to Bosco or R2G.

The following facts bolster the finding that the sale price of $716,846.00 was fair.  R2G advertised that the Redfern Property was for sale in February 2004.  The advertised sale price was $800,000.00.  Offers to buy the Redfern Property, in response to that advertisement generally ranged from $550,000.00 to $800,000.00.  An appraisal of the Redfern Property from July 2003 set its value at $714,000.00.  An appraisal obtained in September 2004, contemporaneous with the sale of the Redfern Property to Redfern Realty, set the value at $700,000.00.  R2G eventually sold the Redfern Property to Redfern Realty for $716,846.00.  Redfern Realty had no affiliation with Bosco or R2G prior to negotiating the purchase of the Redfern Property, and the purchase negotiations and agreements were at arm's length.  "[I]t is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 741-42 (1997)).  The Court therefore finds there is insufficient evidence that the sale price of $716,846 .00 was anything but a fair price, and reasonable under the circumstances.

### Trustee's Claim for Salaries Due

The District Court, in its Remand Order, requested that this Court address whether Coletta is owed compensation for services performed as facility manager at the Redfern Property. [dkt item 184]  The Court finds that Coletta did indeed operate as facility manager at the Redfern Property for a period of ten weeks between November 2002 and March 2003, and

therefore R2G and Bosco are liable for $12,000.00 in unpaid salaries, which is the amount sought by the Trustee.

In addition to disputing that he ever agreed to pay Coletta wages, Bosco alleged that any liability for wages could not begin before he attained actual occupancy of the Redfern Property, which he alleged occurred on February 25, 2003. First, actual occupancy is not defined in any of the parties' agreements as the date Coletta's salary begins to accrue. R2G had obtained Frediva's high-bid rights in October 2002, at a time R2G was still negotiating with Coletta, the central person behind the recycling business. Thus, the date R2G obtained physical occupancy is not inconsistent with Coletta's claim that he acted as facility manager for ten weeks commencing in November 2002, following execution of the November 11 Agreement.

The finding of actual employment is further bolstered by Bosco's October 28, 2002, letter to Coletta, R2G's November 20, 2002, letter to Coletta, and Bosco's June 13, 2003, letter to Coletta's attorney Raymond Verdi, Esq., as well as by the existence of several compensation checks Bosco had written out as payable to Coletta. Though there is a dispute regarding who had possession of the checks and whether they were ever presented to a bank in order to be honored, the fact that R2G wrote, and Bosco signed, the checks is undisputed. The evidence overwhelmingly demonstrates that Coletta did indeed act as facility manager for ten weeks until he found other employment. Coletta is therefore entitled to collect salaries for work performed for ten weeks. Coletta is owed $1,200.00 per week for that time, totaling $12,000.00.

### No Unclean Hands in the Garofalo Assignment and Reassignment

The District Court requested that this Court determine whether the doctrine of unclean hands bars Coletta from recovering under the November 11 Agreement. [dkt item 184]

Under certain circumstances, unclean hands of a party seeking relief, or its inequitable actions in a matter relating to its sought relief, may bar its equitable recovery. *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 329-30 (1994); *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 130-32 (S.D.N.Y. 1999).  The burden of proving unclean hands is on the party asserting the defense, and is met by showing "truly unconscionable and brazen behavior" by the party seeking relief. *Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*, 570 F. Supp. 2d 498, 505 (E.D.N.Y. 2008) (quoting *Freedom Calls Found. v. Bukstel*, 2006 WL 845509, at *23 (E.D.N.Y. 2006)).

As noted above, Coletta and Bosco each acted with dubious business ethics.  However, the Court finds that Coletta's dealings with Garofalo do not rise to the level of unclean hands.  The Court therefore declines to apply the doctrine of unclean hands to bar Coletta from recovering monies from Bosco and R2G.

By way of summary, in October 2003, Coletta assigned his rights under the November 4 Document, a document which had already been superseded by the November 11 Agreement, to Garofalo.  In June 2004, Garofalo reassigned whatever rights he had acquired in the original assignment back to Coletta.  In July 2004, Garofalo released Bosco of all claims he might have against Bosco.

Taken in seclusion, these transactions may seem like an elaborate scheme to defraud Bosco and R2G—Garofalo reassigning his rights back to Coletta before entering into a release agreement with Bosco, with Bosco believing he was being released from all obligations he had to Garofalo and Coletta, including those detailed in the November 4 Document.  In fact, though, these events spanned more than eight months, with many unrelated occurrences in between,

which make the release Bosco received from Garofalo a legitimate business transaction regardless of the rights Coletta had against Bosco and R2G.

Further, according to the parties' testimony, at some point between Coletta's October 2003 assignment to Garofalo and Garofalo's July 2004 release of Bosco, Garofalo moved equipment and machinery onto the Redfern Property and attempted to operate on the premises without Bosco's permission.  Bosco subsequently changed the locks to the premises, denying Garofalo access to the premises and to his equipment.  Subsequently, there were mutual threats between the parties. [June 16 Tr. at 35:5–35:20]  The Court therefore finds that Bosco had an independent basis to desire a release from Garofalo, regardless of the assignment and reassignment of Coletta's rights, and that this was not a scheme to defraud Bosco and R2G.

Further, there is insufficient evidence that Coletta's involvement in Bosco's transactions with Garofalo rise to the level of unclean hands that would bar recovery.  There is insufficient evidence to conclude that Coletta's original assignment of rights to Garofalo was not intended as a legitimate business transaction.  Garofalo's attempts to operate out of the Redfern Property soured, and so Coletta's accepting a reassignment of his rights seems legitimate.  There is insufficient evidence that Coletta had any involvement with the release negotiations between Garofalo and Bosco, or the ultimate release Garofalo granted to Bosco.

The Court finds that Coletta's conduct throughout these transactions does not rise to the level of unclean hands so as to bar his recovery from Bosco and R2G.

Though this fact does not alter the ultimate outcome, it is worth again noting that Coletta's original assignment to Garofalo was of any rights Coletta had in the November 4 Document.  This document was admittedly a draft and was never intended to be a final agreement that granted rights to either party.  Additionally, the November 4 Document was

expressly superseded by the November 11 Agreement.  Coletta testified that he assigned rights in the November 4 Document, instead of in the November 11 Agreement, by mistake, but regardless of intentions, Coletta's assignment of the November 4 Document did not convey any rights to Garofalo.  The reassignment to Coletta months later was therefore superfluous.

Bosco testified that he signed the November 4 Document in October 2003, as part of Coletta's assignment to Garofalo, under threat of physical violence, and that he thereafter considered that document a binding agreement.  The Court does not find this testimony credible.

The November 4 Document clearly states, at the top, that it is a draft, addressed to Bosco for comments.  Further, Bosco was a seasoned businessman.  Bosco had attended the U.S. Military Academy at West Point, and his work experience included time spent in Nicaragua developing a railroad and ports project before he had any dealings with Garofalo.  At one time, he worked out of the U.S. Embassy in Beijing, China.  Bosco also testified that in 2004, months after Coletta's original assignment of rights to Garofalo and the alleged physical intimidation by Garofalo, Bosco changed the locks to the Redfern Property while Garofalo's equipment was on the premises and demanded a full release from Garofalo before allowing Garofalo to recover his equipment. [June 16 Tr. at 35:5–35:20]  The Court finds that Bosco's allegations of intimidation by Garofalo, and his testimony about signing the November 4 Document in October 2003 and considering it a binding agreement, unconvincing.

### *The Section 548 Avoidance Action Must Fail*

The Remand Order from the District Court requested this Court to address whether the Trustee has standing to assert a fraudulent conveyance claim against Bosco and R2G for the transfer of the Redfern Property to Redfern Realty. [dkt item 184]

Section 548 of the Bankruptcy Code allows a trustee to avoid a fraudulent transfer of a debtor's property interest if that transfer was made within the two years preceding the bankruptcy filing date. 11 U.S.C. § 548(a)(1). For a transfer to be considered fraudulent, the debtor must have (A) had actual intent to hinder, delay, or defraud certain entities, or (B) received less than a reasonably equivalent value in exchange for such transfer, along with having met certain insolvency criteria at the time of the transfer. *Id.*

The Trustee in the present case cannot avoid the transfer to Redfern Realty under Section 548 of the Code. Prior to the Frediva foreclosure, the Colettas, the Debtors in this case, had no interest in the property. The property was owned by Coletta Properties, and not by Michael or Susan Coletta personally. At no time relevant to the transactions at issue did the Colettas own an interest in the property. Coletta had no property interest that was transferred in R2G's sale transaction, and because the Trustee is not the trustee for Coletta Properties, the Trustee cannot avoid that transfer under Section 548 of the Bankruptcy Code.

Alternatively, the transfer does not meet the Section 548 fraud criteria. In order to avoid a transfer, a trustee must show actual fraud under Section 548(a)(1)(A) or constructive fraud under Section 548(a)(1)(B). The Court finds no evidence of a transfer with actual fraudulent intent by R2G, Bosco, or Coletta.

Regarding constructive fraud, a trustee generally bears the burden of proving that a transfer was for less than reasonably equivalent value. *Rosen v. Barclays Bank of N.Y.*, 115 B.R. 433, 434-35 (E.D.N.Y. 1990); *Pryor v. Fisher (In re Dimino)*, 429 B.R. 408, 417 (Bankr. E.D.N.Y. 2010) (citing *Bayou Accredited Fund, LLC v. Redwood Growth Partners, LLP (In re Bayou Group, LLC)*, 396 B.R. 810, 827 (Bankr. S.D.N.Y 2008) *rev'd in part on other grounds*, 439 B.R. 284 (S.D.N.Y 2010)). This is a determination of fact, taking into consideration the

totality of the circumstances. *In re Dimino*, 429 B.R. at 417. As noted above, the transfer of property by R2G to Redfern Realty was for reasonably equivalent value. As such, there was no constructive fraud, and the Trustee did not meet his burden of proof under Section 548.

### Conclusion

For the reasons stated above, this Court finds Bosco and R2G jointly and severally liable for $12,000.00 of unpaid salaries to Coletta, together with pre-judgment interest accruing at the rate of 9% *per annum* on said sum from March 31, 2003, through December 1, 2009, the date the Judgment was entered. Additionally, the Court finds Defendants liable for Plaintiff's costs in the Consolidated Adversary Proceeding, in the sum of $250.00. Those sums amount to a total judgment of $22,208.81. All other claims by Coletta against Bosco and R2G are denied.



Dated: February 10, 2011
Central Islip, New York

_____
**Alan S. Trust**
**United States Bankruptcy Judge**